MORGAN LAKE COMPANY, Respondent, *v.* THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Appellant.

(Argued June 5, 1933; decided July 11, 1933.)

*Madison G. Gonterman* and *Gilbert N. Reed* for appellant.

*Elijah T. Russell* for respondent.

CRANE, J. This action is brought by the Morgan Lake Company to recover damages caused by the operation of trains over Morgan lake, situated in Dutchess county. The smoke and cinders from the locomotives, it is claimed, damaged the crop of ice, from the year 1908 to 1928. The referee, to whom the action was referred, allowed damages for the years 1913 to 1916 and from 1920 to 1928, in the sum of $63,377.90, and interest from

the commencement of the action, $16,266.99, amount in all, $79,644.89.

The basis of the cause of action is a covenant in the two deeds from the owner of the lake conveying to the railroad company and its predecessors the right of way over the lake. The first deed is dated October 13, 1888, made by Julia A. Morgan to the Poughkeepsie Bridge Railroad Company, wherein she conveyed a strip of land over the lake for the purposes of a railroad, the grantee covenanting and agreeing to make and maintain good and sufficient farm crossings over and under the railroad built upon the strip, for the use of the adjoining lands of the grantor, and covenanting further as follows: " The said Company further covenants to pay for any damages by sparks, ashes, cinder or coal dust from said Railroad or its use, to the ice on said Morgan Lake beyond fifty feet on each side of the strip above conveyed, any judgment recovered for such damage to be a lien upon the premises above conveyed prior to any mortgage thereon. And further that should any judgment for such damage remain unpaid for three months from the final determination thereof, then all rights of the said company, in the lands above conveyed to cease and the parties to be restored to their original rights before this deed was given.

" These covenants on the part of said Railroad Company to run with the land as against the successors and grantees of the said Railroad Company."

This deed was executed by both the grantor and the grantee. The property of the Poughkeepsie Bridge Railroad Company was thereafter and in 1899 conveyed through mesne conveyances to the Central New England Railroad Company, which continued to operate the railroad and use the property conveyed for railroad purposes. Julia A. Morgan, the original grantor, by deed dated February 15, 1902, sold and conveyed all her property here in question, together with the appurtenances and all her estate, title and interest therein to the Morgan

Lake Company, the plaintiff herein, which company, by deed dated May 31, 1910, sold and conveyed to the Central New England Railway Company a small parcel of land immediately adjoining on the south of the parcel conveyed by the deed of 1888. It contained about .27 acres, more or less. By this deed, the Central New England Railway Company made additional covenants affecting the railroad property over the lake, and assumed the covenants and agreements of its predecessor in title, the Poughkeepsie Bridge Railroad Company, as contained in the original deed of 1888. The words of the covenant are repeated in the deed of May 31, 1910, executed by the Central New England Railway Company, and are as follows:

" The said Company further covenants to pay for any damages by sparks, ashes, cinder or coal dust from said railroad or its use to the ice in said Morgan Lake beyond fifty feet on each side of the strip above conveyed, any judgment for such damage to be a lien upon the premises above conveyed prior to any mortgage thereon, and further should any judgment for such damage remain unpaid for three months from the final determination thereof, then all rights of the said Company in the lands above conveyed to cease, and the parties to be restored to their original rights before this deed was given. These covenants on the part of said railroad company to run with the land as against the successors and grantees of the said Railroad Company.

" The party of the second part hereto, covenants and agrees that all of the above covenants and agreements shall apply to the premises hereby conveyed, for the benefit of the party of the first part hereto, to the same extent and effect as though the premises hereby conveyed were included in the deed from Julia A. Morgan to the Poughkeepsie Bridge Railroad Company above described and entitled to the benefits of the covenants and agreements in said deed contained and the party of the second

part hereto assumes all of said covenants and agrees to carry out said covenants in full, with relation to the premises hereby conveyed."

The defendant in this case, The New York, New Haven and Hartford Railroad Company, absorbed the Central New England Railway Company, by an act of merger, the certificate bearing the date October 23, 1926, and by virtue of such merger became vested with all the property and railroad rights and bound by all the obligations of the said company. Article 8, section 85 of the Stock Corporation Law (Cons. Laws, ch. 59) provides that upon such merger, " the possessor corporation shall be deemed to have assumed all the liabilities and obligations of the merged corporation and shall be liable in the same manner as if it had itself incurred such liabilities and obligations."

This action was thereupon commenced March 31, 1928, against this merging defendant to recover damages for injuries to the ice crop in the various years above specified. In my judgment these covenants in the deeds of 1888 and of 1910 ran with the land and were binding upon subsequent grantees of the land conveyed. The railroad, knowing that Morgan lake was used for raising and selling of ice, accepted a strip of land over the lake for the operation of a railroad, covenanting to repair the damage caused by such operation. Although the deeds in question contained a provision to the effect that the covenants ran with the land, such provision in the absence of the other legal requirements is insufficient to accomplish such a purpose. (*Mygatt* v. *Coe*, 147 N. Y. 456; *Sebald* v. *Mulholland*, 155 N. Y. 455; *Crawford* v. *Krollpfeiffer*, 195 N. Y. 185.) The intention, however, is very clear, to charge the property granted, so long as it was used for railroad purposes, with the duty of saving the adjoining property harmless from the effects of such operation. It was in the nature of a covenant not to injure, only it was expressed in the affirmative by agreeing to make

good the injury and repair the loss by the payment of damages which, when ascertained, were to be a lien upon the property before other incumbrances. It seems to me as though this covenant was in the nature of a covenant to build fences along boundary lines or covenants relating to party walls or to repair buildings. Thus, a covenant to maintain a driveway and keep it in repair in front of premises conveyed abutting on such driveway has been held by this court to be a covenant running with the land. (*Levy* v. *Schnurmacher Construction Corp.*, 255 N. Y. 83.) Such a covenant by express words might even attach to land and run with it, although that land did not abut upon such a driveway, but received some benefit from it. This subject has recently been treated quite fully in *Guaranty Trust Co.* v. *New York & Queens County Ry. Co.* (253 N. Y. 190) and *Greenfarb* v. *R. S. K. Realty Corp.* (256 N. Y. 130), where the leading cases have been collected.

Some of my associates are inclined to a different view, considering this covenant as one coming within the settled rule of law that a covenant to do an affirmative act, as distinguished from a covenant merely negative in effect, does not run with the land so as to charge the burden of performance on subsequent grantees. They reason that the agreement or covenant to pay damage for destroyed ice was affirmative in nature, pertaining to the estate of the grantor, not binding upon or affecting the estate conveyed. While not sharing this view myself, for the reasons I have above stated, we will pass the point without deciding it, as we are in agreement that the plaintiff nevertheless may maintain this action upon the later covenant personal in nature, made by the Central New England Railway Company in the deed of 1910, and assumed under operation of law by the defendant, the New York, New Haven and Hartford Railroad Company. By this deed the defendant in effect agreed with the plaintiff to pay for all damage caused by sparks, ashes,

cinders or coal dust to the ice in Morgan lake beyond fifty feet on each side of the strip conveyed to the railroad company. The referee has found that the earliest date from which to compute the plaintiff's loss was the year 1913, which is subsequent to this covenant between the parties to this litigation.

The only question remaining, therefore, on this appeal is the rule applied by the courts below and adopted by the plaintiff in arriving at its damage. On a previous trial, the Appellate Division reversed a judgment for the plaintiff because of the wrong measure of damage and sent the case back for a new trial, stating in its *per curiam* opinion the following: " It appears from the record that plaintiff was able, upon the trial, from books in its possession, to determine just how much ice it sold during the period mentioned and the actual prices obtained therefor. Plaintiff, however, did not prove its actual damages by showing the difference between the value of the ice it sold, if the same was good ice, and the actual amount received for the ice as sold. This would represent the actual loss sustained by plaintiff and it can recover no more." (230 App. Div. 356, 357.)

Acting upon this suggestion the plaintiff apparently proceeded before the referee on this hearing, to measure its damage by the difference between the price it received for its " peppered " ice and the market value of clear ice. In his brief upon this appeal the learned counsel for the respondent says: " The Appellate Division of the second department, upon appeal, reversed (230 App. Div. 356), solely upon the ground that we had adopted the wrong measure of damage, holding that we should take the quantity of ice sold from our books, together with the price received, and offset that against the value of the same quantity of ice in a clear and clean condition." A reading of the evidence shows that this was the method pursued before the referee. The books of the plaintiff had been examined by an expert and cal-

culations made to show the sales of the dirty ice and the price received therefor, and the market value of clean, unspotted ice. No objection was made by the defendant to the use of the plaintiff's books for the purposes of proving these sales, the quantity sold and the amount received. Objection was raised, however, by proper exception, to the failure of the plaintiff to prove that the amounts thus received were a fair, reasonable price for the plaintiff's ice, such as it was. The spotted ice had some market value. Much of the evidence shows that the ice in its peppered or dirty condition was sold along with other ice obtained elsewhere for the market value of clear ice. During all this period, the price of ice fluctuated considerably, due to shortage in natural ice, weather conditions and the thickness of the crop. There was no regular standard price from season to season. No difficulty was found in proving for all of these respective years the market price for clear ice. Little or no attempt was made to show the value, the fair market value, of the plaintiff's ice. We have a summary and statement in the evidence of the price at which it sold, as taken from the books, but whether this was the fair, reasonable market value of such ice, in its present condition, did not appear except in the manner I shall presently state. It is fair to the plaintiff's lawyer to state that following the rule laid down by the Appellate Division, he adopted the difference between the market value of clear ice and the price as shown by the books received for the plaintiff's peppered ice, without clearly and sufficiently showing that such book value was also the fair market value for such ice. Had this defective ice no market value, or had it appeared in the evidence that the plaintiff could only dispose of it as so much waste material for what it would bring, a different case would be presented. All through the evidence, however, it appears that such spotted ice had a market value, that it was sold in large quantities, had a use in the various industries and could

be and was disposed of to the dealers and the trade. We must assume, therefore, that there was a market value for clean, clear ice and also a market value for ice of a different grade, ice, for instance, which had in it soot or dirt or cinders in more or less quantities. For refrigerating purposes such ice may be as good as clear ice.

We state these facts in order to emphasize the rule that the price at which an article is sold is not always evidence of its market value. The statement in the Appellate Division opinion did not go quite far enough. The plaintiff was bound to prove not only the amount which it had received for its low grade ice, but also that this was the fair market value. The price for which property is sold by a party is not always admissible in its favor as evidence of its market value. (*Latimer* v. *Burrows*, 163 N. Y. 7.) It is in effect admitting in his favor proof of his own act or an act to which he is an essential party amounting to self-serving declarations in his own behalf. (*Groves* v. *Warren*, 233 N. Y. 160.) When property has a market value which can be proved by witnesses who can then and there speak of it, it must be proved by such witnesses. (*Jones* v. *Morgan*, 90 N. Y. 4, 10.)

The importance of this rule becomes apparent in this case. The plaintiff's director, president and general manager was George Morgan, its principal witness upon this trial. During the years here in question he conducted an ice business on his own account and bought at the flat rate of two dollars per ton a large amount of the plaintiff's ice. The sixty-fourth finding of the referee is: " That the plaintiff's books indicate that during the period from 1921 to 1928, inclusive, about 38,731,407 pounds of Morgan Lake ice were sold to George Morgan, which constituted approximately seventy-two per cent of the total amount of Morgan Lake ice sold by the plaintiff during said period, as shown by the plaintiff's books." The sixty-fifth finding is: " The plaintiff's books indicate

that during the period from 1913 to 1918, inclusive, about 3,092,065 pounds of Morgan Lake ice were sold to George Morgan." The referee also found that this price of two dollars per ton was a fair value, but the evidence is very confusing. Morgan subsequently sold this ice for a much larger amount. In the first bill of particulars, or estimate of damage, furnished by the plaintiff, setting forth its claim, the following prices were given as having been received by the plaintiff for its defective ice at retail for the various years, as follows: 1913, 1914 and 1915, three dollars per ton; 1916, two dollars per ton; 1917, two dollars twenty-five cents per ton; 1918, four dollars per ton; 1920, three dollars fifty cents per ton; 1921, four dollars fifty cents per ton; 1922, 1924, 1925, three dollars and fifty cents per ton; 1923, three dollars per ton; 1926, 1927 and 1928, three dollars and forty cents per ton. Morgan swore repeatedly in affidavits and upon the trial under cross-examination that these figures were the fair market value of the ice which was sold during the years stated. Yet the referee found there was no unfairness in selling ice to Morgan at two dollars per ton. He also found that the value of clear ice from 1913 to 1917 was three dollars and twenty-five cents per ton and from 1921 to 1928 was three dollars and seventy-five cents per ton. If the plaintiff's first figures were correct, it had suffered little or no damage. On the first trial Morgan had testified: " We have always done fairly well on the ice business. We made a living. That's about what the majority of the people are doing." And on this trial he was asked: " Q. You mean by that to say that during all of that time the Morgan Lake Ice Company did fairly well in the ice business? A. Yes, sir."

An amended bill of particulars or information was given because of a re-examination of the books by a Mr. Abell, an expert who found that the amount received per ton during the various years was less than that stated in this first bill of particulars. It is upon this latter book

examination that the referee bases his finding of the amount received by the plaintiff and a difference of $63,377.90 between that amount and the value of clear ice. But there is no evidence, may we say, no evidence of any probative value, that these subsequent corrected figures represent the market value of the damaged ice.

Let me make clear what we have in mind, as we do not intend to review the weight of the evidence. The first figures given in the bill of particulars as the amount received by the plaintiff shows little or no damage. The very last thing testified to by Mr. Morgan is this:

" Q. Then your testimony as set forth in your bill of particulars as to the market price for which the ice sold during these same periods, is true, isn't it? A. Yes.

" Q. Then how can you change it or do you want to change it? A. I am not changing it.

" Q. Then I understand your testimony as set forth in your original bill of particulars as to the market value of the ice as specified in the bill of particulars as sold during that period, is true, as to the market value of that ice? A. Yes, sir."

Abell, in examining the books, found the plaintiff had received less than these figures given in the bill of particulars, and Morgan does then one of two things: he either swears to the original bill as stating the true market value from which the plaintiff would have received little or no damage, or else he changes the estimate of market value simply and solely because on a reauditing of the books the company was found to have received less. There is no independent testimony either by Morgan or any of his witnesses that these amended or supplemental figures show the fair reasonable market value, except as the figures speak for themselves.

" Q. Then you change your testimony in regard to the market value of the ice sold by Morgan Lake during the period in question solely because of the audit of the books

and the report made to you by Mr. Abell? A. I naturally admitted that was more perfect and more in detail than ours was.

"Q. Will you answer it yes or no? A. Yes."

What we have in mind in forming our conclusion is this: The plaintiff may recover from the defendant the damage which it has sustained by reason of the damage done to its ice during the years in question; the measure of the damage for this case is the difference between the market value of clear ice and the fair, reasonable value in the market for the plaintiff's damaged ice. It is quite apparent that the plaintiff, acting upon the suggestion in the opinion of the Appellate Division, adopted the price received for the damaged ice according to the books, as the basic figure, and failed to prove that this price was the fair, reasonable market value. The referee adopted this measure of damage, as can be seen from his report, and made no finding as to the reasonable value of the damaged ice or that the price received by the plaintiff was the only available means of disposing of the product. Proceeding upon the wrong assumption and theory, it is difficult now for the plaintiff to sustain this judgment under a different rule of damage. That the referee had no difficulty in finding the market value of clear ice is quite apparent. The proper measure of damage would suggest that he should also have found the market value of the damaged ice, whereas all he has given us is the sales price. This is insufficient.

We hesitate very much to reverse this case and send it back for another — the third — hearing, and yet it seems right and just so to do. No doubt the plaintiff has suffered damage and is entitled to recover it. We mean to cast no reflections either upon the merits of its claim or upon the amount of its damage, and what we have said must not be taken as any indication bearing upon its right to establish its claim to the full. What we do hold, however, is, that it is equally fair to the defendant that if it is obliged

to pay damage according to its covenant, that damage should be proved by clear and substantial evidence. If there be difficulty in arriving at the fair value of damaged ice twenty years ago, it is due entirely to the plaintiff's delay in presenting its claim. Men do not readily submit to a loss year after year without making some effort to collect it. While this may not be a suspicious circumstance in view of the nature and financial responsibility of the various railroads operating the property, yet it is no excuse for the plaintiff's inability to furnish legal evidence. Its loss must be measured by legal standards, not left to surmise; it must prove upon the rehearing the fair value of the damaged ice which it sold which we think it has failed to do on this trial.

As to the question of interest, our decision in *Preston Co.* v. *Funkhouser* (261 N. Y. 140) justifies its allowance, as decided by the referee.

For the reasons here stated, the judgment should be reversed and a new trial granted, with costs to abide the event.

POUND, Ch. J., LEHMAN, KELLOGG, O'BRIEN and CROUCH, JJ., concur; HUBBS, J., not sitting.

Judgment reversed, etc.